DELBELLO DONNELLAN WEINGARTEN          *Hearing Date: October 19, 2016*
WISE & WIEDERKEHR, LLP                 *Hearing Time: 10:00 a.m.*
*Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Julie Cvek Curley, Esq.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

                                      Chapter 11
MACELLERIA RESTAURANT, INC.,          Case No. 16-12110 (MKV)

                          Debtor.
----------------------------------------------------------X

### DEBTOR'S MOTION FOR ORDER (I) APPROVING A PRIVATE SALE OF THE DEBTOR'S RESTAURANT AND RELATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE DEBTOR'S NONRESIDENTIAL REAL PROPERTY LEASE WITH WEST VILLAGE LLC IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

TO:    THE HONORABLE MARY KAY VYSKOCIL,
       UNITED STATES BANKRUPTCY JUDGE:

Macelleria Restaurant, Inc., the debtor and debtor-in-possession herein (the "Debtor"), by

its attorneys, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP , files this motion (the

"Motion") seeking entry of an order pursuant to §§105, 363, and 365 of 11 U.S.C. §101, et seq.

(the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure and Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court

for the Southern District of New York (i) authorizing the private sale of substantially all of the

Debtor's assets related to its restaurant business to The Meatpackers, Inc. ("Purchaser") pursuant

to the Asset Purchase Agreement dated September 26, 2016 (the "APA"), free and clear of any

and all claims, liens, encumbrances and other interests; (i) authorizing the assumption and assignment to Purchaser of the Debtor's Lease (defined herein below,) including fixing applicable cure costs related thereto; and (iii) granting Purchaser good faith protection. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding has been initiated pursuant to Bankruptcy Code §§ 105(a), and 363.

## BACKGROUND

4.      On July 25, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is operating its business as debtor-in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in this Chapter 11 Case.

5.      The Debtor formerly owned and operated an Italian steakhouse known as *Macelleria* in the heart of New York City's Meatpacking District (the "Restaurant"). When the Restaurant opened in 2000, it was located near Gansevoort Plaza at 48 Gansevoort Street, between Greenwich Street and Washington Street, New York, New York. At that location, the Restaurant was constructed from a former downtown meat locker, with two-story exposed brick walls, hinged doors, antique butcher blocks, vintage cases, and original 17th century Dutch stone in the wine cellar, embracing the history of the era and presenting a unique space for dining, private parties, and events.

6.      The Debtor's lease with its landlord, Gansevoort Street Ventures, LLC, whose principal is the same principal as the Debtor's current landlord, West Village, LLC, ("Landlord"), expired in 2008 and was renewed for two (2) years, on two (2) occasions, with periods in excess of five (5) months, both before and after, where the Debtor was on a month-to-month lease, making it difficult to engage in long term business planning.

7.      In 2014, Landlord refused and ignored repeated requests to extend the Debtor's lease. As a result, in 2015, the Debtor began exploring alternative locations, and ultimately took an assignment of lease (the "Lease") for the restaurant space across the street, at 1-3 Little West 12th Street on Gansevoort Square, which was also owned by the Landlord. The Lease has nineteen (19) years remaining, and expires on November 15, 2035.

8.      The Debtor's new premises consists of a 4,500 square foot of restaurant space seating 170 people, with 2 bars, 40 foot of frontage, two party rooms, exhibit kitchen, sidewalk café on the first floor, and on the lower level, one of the bars, prep kitchen, and 5 bathrooms. The premises has been partially built out and the Debtor has obtained and maintained current all permits.

9.      Given the Debtor's past difficulties with the Landlord, the Debtor explored the option of selling and assigning the Lease. After consulting with an attorney, the Debtor was informed that it could assign the Lease to a qualified assignee.

10.     To that end, the Debtor began marketing the sale of the Restaurant. These efforts procured one serious party, which invested hundreds of thousands of dollars into acquiring the Restaurant, including hiring engineers, designers, and architects. This buyer was backed by a large private equity group and was more than financially qualified. However, after nearly one (1) year of working on the assignment of the Lease, these efforts fell through when the Landlord

unreasonably withheld its consent to the assignment of the Lease in May, 2016, leaving the Debtor with mounting debt in excess of $1,600,000.00. Additionally, in desperation and in an effort to obtain consent from the Landlord for the assignment of the Lease, as early as March 2016 and again in May 2016, the Debtor offered to pay the Landlord a portion of the sales price, which offer was ultimately rejected by the Landlord after additional delays and unreasonable monetary demands by the Landlord. Upon information and belief, this buyer has since moved onto another project and has entered into two (2) other leases in New York City with other landlords this past year.

11.    Subsequently, the Debtor retained Great American Brokerage, Inc. (the "Broker")[1] to market and sell the New Lease, and the Debtor's assets located at the Restaurant. Broker's efforts initially proved successful and the Debtor received an offer from The Resette Hospitality Group in the amount of $1.2 million. The Purchaser agreed to be a "stalking horse" so that its offer would be subject to higher and better offers at an auction. However, disappointingly, The Resette Hospitality Group informed the Debtor that after completing its due diligence, and prior to executing a contract of sale, they decided not to proceed with the acquisition of the Debtor's assets.

12.    Although the initial terms of the agreement with Broker expired, Broker has continued its efforts to scour the market and pursue leads to procur another purchaser. In addition, the Debtor's principals began reaching out to their industry contacts, as well as their personal contacts, to procur another purchaser.

13.    On or about September 15, 2016, the Debtor received an offer from the Purchaser. After several rounds of negotiations, the parties agreed to a purchase price of $1.1 Million, all

---

[1] The Debtor's engagement with Great American Brokerage, Inc. was approved by this Court by Order dated August 22, 2016 [Docket No. 25].

cash, no contingencies, and an immediate closing.

14. On September 26, 2016, after arms-length negotiations, the Debtor and the Purchaser entered into the Asset Purchase Agreement ("APA"), a copy of which is annexed hereto as **Exhibit "A"**, and tender the $110,000 downpayment, which is currently being held in escrow by DelBello Donnellan Weingarten Wise & Wiederkehr, LLP**.** Subject to this Court's approval of higher and/or better offers through an auction process, the Debtor seeks approval to sell the Assets (as defined in the APA) to the Purchaser on the following terms and conditions:

| | |
|---|---|
| **Seller** | Macelleria Restaurant, Inc. |
| **Purchaser** | The Meatpackers, Inc. |
| **Purchase Price** | $1,100,000 payable as follows: (i) $110,000 downpayment currently held in escrow by DelBello Donnellan Weingarten Wise & Wiederkehr, LLP (the "Downpayment"), and (ii) $990,000 payable at closing (the "Closing Payment"). |
| **Acquired Assets** | At the closing (the "Closing") of the Acquisition, Purchaser would purchase from Debtor, and Debtor would sell to Purchaser, all of its right, title and interest, if any, in and to the following assets associated with the Business: (i) all of Debtor 's rights title and interest in and to that certain real property lease, as amended from time to time, (the "Lease") for the premises known as 1-3 Little West 12th Street, New York, NY 10014 (the "Premises"), together with all improvements made to the Premises, (ii) all security deposits and other deposits, applications, licenses and permits, and (iii) all of the Debtor's rights, title and interest in and to any and all Permits, licenses, approvals and authorizations by a federal, state, local or foreign governmental or non-governmental board, bureau, agency or regulatory body, to the extent transferable or assignable (collectively, the "Acquired Assets"). The Acquired Assets will be transferred at Closing on an "as is where is" basis free and clear of all liens, claims, security interests and encumbrances and shall be subject to court approval and an order approved by the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court"). |
| **Excluded Property** | (i) All claims against Purchaser arising under or in connection with this Agreement; (ii) cash; (iii) accounts receivable generated prior to the Closing Date; (iv) All contracts, leases or other agreements, other than the Lease, (v) All raw materials, work-in-process, finished goods and merchandise, packaging materials and other supplies related thereto |

|  | which are owned or used by the Debtor; (vi) All rights of the Debtor under insurance policies; (vii) all rights with respect to the Debtor's bank accounts; (viii) all right, title and interest in all intellectual property rights owned by Seller, including, without limitation, customer and supplier lists and records, recipes, domain names, websites, URLs, telephone numbers, trademarks, service marks, trade names, copyrights, patents, and all registrations thereof and applications therefor, and all common law rights thereto, together with all goodwill associated therewith, and all designs, sketches, drawings, and architectural plans (the "Intellectual Property"); (ix) "Estate Causes of Action" as defined in Chapter 5 of Title 11, United States Code; and (x) the Purchase Price. |
|---|---|
| **Representations and Warranties; Covenants** | The representations and warranties and covenants are customary for a transaction of this type, including, without limitation, representations and warranties regarding the authority to enter into the sale transaction and the agreement to abide by all laws with respect to the sale, litigation, material contracts, permits, environmental matter, ownership of Property, taxes and condition of the Property, the best efforts of the parties, notices and consents, access to information and the risk of loss. |
| **Closing Date** | The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, no later than ten (10) days after entry of the Sale Approval Order. |

## RELIEF REQUESTED AND BASIS FOR RELIEF

15.    By this Motion, the Debtor seeks approval of a private sale of the Restaurant and related assets, including the assumption and assignment of the Lease to the Purchaser as a private sale transaction.

16.    Pursuant to the APA, Purchaser shall acquire, and the Debtor shall convey by private sale, all of the right, title and interest that Debtor possesses as of the Closing in and to the Purchased Assets, as such term is defined in Section 2.1 of the APA, free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code (the "Liabilities"). In

consideration of the sale of the Purchased Assets covered by the APA, the purchaser will pay the

Purchase Price of $1.1 million at Closing.

A.    **Debtor's Sale Pursuant to Bankruptcy Code §363(b) and (f) is Appropriate**

17.    Section 363(b) of the Bankruptcy Code provides, in pertinent part, that the Debtor

"after notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate". 11 U.S.C. §363(b)(1). Inasmuch as the Purchased Assets constitute the

Debtor's on-going business and are substantially all of the Debtor's business assets, the proposed

sale is out of the ordinary course of the Debtor's business.

18.    Section 363 does not set forth an express standard for determining whether a sale

of property under §363(b) should be approved; however, courts that have interpreted this section

consistently apply an "articulated business judgment" standard. *See, Stephen Indus., Inc. v.

McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Continental Airlines, Inc.*, 780 F.2d 1223,

1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Walter*, 83 B.R. 14,

17 (Bankr. 9th Cir. 1988); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr.

E.D. Mo. 1990); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re

Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio  1984).

19.    The Court of Appeals for the Second Circuit first enunciated this standard by

stating: "The rule we adopt requires that a judge determining a §363(b) application expressly

find from the evidence presented before him at the hearing *a good business reason* to grant such

application." *Lionel*, 722 F.2d at 1070-71 (emphasis added).

20.    Section 363(b) does not require that the Court substitute its business judgment for

that of the Debtor, *See, e.g., Ionosphere Clubs*, 100 B.R. at 676 (court will not substitute a hostile

witness's business judgment for a debtor's, unless testimony "established that the [debtor] had

failed to articulate a sound business justification for its chosen course"). Rather, the Court should

ascertain whether a debtor has articulated a valid business justification for the proposed

transaction. This is consistent with "the broad authority to operate the business of the Debtor . . .

[which] indicates congressional intent to limit Court involvement in business decisions by a

Trustee . . . [so that] a Court may not interfere with a reasonable business decision made in good

faith by a Trustee". *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

21.     Other courts have approved the sale of a debtor's assets under §363(b)(1) of the

Bankruptcy Code when (i) the sale is supported by the sound business judgment of the debtor's

management; (ii) interested parties are provided with adequate and reasonable notice; (iii) the

sale price is fair and reasonable; and (iv) the purchaser has acted in good faith. *See, e.g., In re*

*Betty Owens Schools, Inc.*, WL 188127 at *4 (S.D.N.Y. 1997) (setting forth the foregoing four

elements in connection with the 363(b)(1) inquiry and citing *In re Delaware & Hudson Ry. Co.*,

124 B.R. 169 (D. Del. 1991); *In re General Bearing Corp.*, 136 B.R. 361, 365-66 (Bankr.

S.D.N.Y. 1992) (suggesting that the salient factors under *Lionel* are the foregoing elements).

Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." *In re Ames Dept. Stores, Inc.*, 136 BR 357, 359 (Bankr. S.D.N.Y. 1992);

*In re Integrated Resources, Inc.*, 147 B.R. at 656-57 (S.D.N.Y. 1992) (a debtor's business

judgment is entitled to substantial deference with respect to the procedures to be used in selling

assets from the estate). The Debtor has determined that the maximization of the return to

creditors can best be accomplished through the proposed asset sale upon the terms contained in

the APA and that the transaction is in the best interests of its estate and creditors and should be approved by the Court.

22.     In determining whether a "sound business purpose" exists with respect to a sale of assets prior to confirmation of a plan, Courts have looked at such factors as: the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value. *Lionel*, 722 F.2d at 1071.

23.     In the Debtor's business judgment, the relief sought will maximize the Debtor's recovery on its assets and is therefore in the best interests of its estate and creditors. Specifically, the soundness of the Debtor's decision is supported by the fact that the Debtor has not operated at all in this Chapter 11 Case to date and has continued to accrue administrative rent, professional fees and expenses as each day passes. The Debtor has sufficiently tested the market for interested parties and purchasers, and believes that the offer received by Purchaser is the highest and best offer that can be received within the constrained time frame. The Purchaser has indicated it was unwilling to enter into the APA unless the sale was private and not made subject to higher and better offers. Moreover, should the Debtor further "test" the market for other purchasers at an auction, the additional administrative expenses accrued  in connection with the time delay (i.e., additional accrued rent expenses) and the costs of conducting an auction would likely diminish, and possibly completely erode any distribution to the general nonpriority

unsecured creditors, who are anticipated to receive a pro rata recovery from the contemplated

sale transaction.

24.    Following the consummation of the private sale to the Purchaser, the Debtor

estimates the following distributions under a chapter 11 plan:

| | |
|---|---|
| PURCHASE PRICE: | $1,100,000.00 |
| Professional Fees: | |
|   Brokers | $100,000.00[2] |
|   Attorneys | $75,000.00 |
|   Accountants | $25,000.00 |
| Landlord (through 10/31/2016) | $480,000.00, less the Debtor's claims to be adjudicated |
| NYS Dept Tax & Finance | $107,000.00 |
| Secured Claim (Julie Darwent) | $27,500.00 |
| Other Secured Claims | $45,000 |
| City of New York | $100,000.00 |
| Estimated US Trustee Fees | $6,825.00 |
| Estimated Remaining for | |
| General Unsecured Creditors | $88,675.00 (Approx. 8% Distribution) |

25.    The Purchaser is eager to close and the parties have discussed a closing on or

before October 31, 2016. Should the Debtor "test" the market and conduct an auction, an

additional month of rent and legal fees would accrue ($48,612.48 per month), and thereby

significantly diminishing the distribution to the general unsecured creditors in half.

26.    An immediate sale of The Debtor's assets is the only viable option that will allow

for any recovery to creditors. Any additional delay will leave the estate with diminishing returns.

Time is therefore of the essence with respect to approval of the proposed sale.

**B.    Justification for Private Sale**

27.    Time is of the essence and critical in closing on a sale of the Debtor's assets, as

the administrative expenses of this Chapter 11 Case continue to accrue and erode the distribution

to the Debtor's creditors.

---

[2] Includes any co-brokers to be paid at closing, subject to allowance by this Court.

28.     While many section 363 sales are conducted under competitive bidding procedures, there is no requirement in section 363 of the Bankruptcy Code to do so. In fact, Bankruptcy Rule 6004(f) specifically contemplates private sales with the statement that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction". Courts have noted that private sales are appropriate under section 363 in circumstances similar to the instant case. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction").

29.     Accordingly, courts in this District have approved private sales of assets when they think the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., *In re Wellman, Inc.*, Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sales of one of the debtors' facilities' by private sale, not subject to higher and better offers); *In re Delta Air Lines, Inc*., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft"); *In re Angelo & Maxie's, LLC*, Case No. 11-11112 (SCC)(private sale of famous NYC restaurant approved despite not yielding 100% recovery to creditors).

30.     Given (a) the substantial marketing of the Debtor's assets both pre- and post-petition, (b) the lack of any other offer to date, (c) the significant cash purchase price being

offered by the Purchaser, (d) the continued deterioration of the Debtor's estate to the detriment of the unsecured creditors, and (e) the Purchaser's desire to immediately close, the Debtor believes that the private sale is justified and the best way to maximize value and save jobs.  It is extremely unlikely that an overbid process will generate higher and better offers for the Debtor's assets. Moreover, because of the substantial accruing administrative claims, conducting even an expedited overbid process would impose significant carrying costs on the Debtor's estate which the Debtor will have no ability to pay.

31.    It is submitted that the Debtor and the Purchaser are proceeding in good faith and at arm's length. The Purchaser is not an insider of the Debtor and the transaction was negotiated in good faith, through separate counsel, and only entered into after protracted negotiations.

32.    For all of these reasons, the private sale of the Debtor's assets as requested herein should therefore be approved.

**C.    The Debtor Has Exercised Sound Business Judgment**

33.    The Debtor believes that the sale to the Purchaser represents a prudent and proper exercise of its business judgment and is supported by articulated business reasons because, absent such a sale, the Debtor would likely be forced to liquidate, resulting in no distribution to unsecured creditors, the loss of jobs of the Debtor's employees (over 100) and the loss of going concern value discussed above. With the sale to Purchaser, the Debtor is maximizing the value of its assets, preserving jobs and generating proceeds for distribution to its creditor constituents. *See, NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) (the "fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources"); *In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ("public policy, as evidenced by

Chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values"). Without the sale, the Debtor has no exit scenario other than liquidation, leaving creditors with far less, likely no distribution from the proposed sale of the Assets.

D.    **The Sale Price is Fair and Reasonable**

34.    The sale to Purchaser represents the highest and best price for the Purchased Assets secured by the Debtor to date. The Debtor had previously received an offer from another interested party in the amount of $1.2 million (only $800,000 in cash at closing with the balance over 3 years), however, after completing due diligence, the interested party declined to proceed. Further, early in 2016, as discussed above, the Debtor had received an offer from another party, Burger & Lobster, in the amount of $1.0 million. However, after several months of attempting to obtain approval from the landlord for the assignment of the Lease, which consent was unreasonably withheld, this party decided not to proceed, and instead the Debtor incurred significant carrying costs attributable to the landlord's tactics.

35.    Consequently, in the Debtor's view, the Purchase Price represents substantial value to the Debtor's estate and provides favorable terms for disposition of the assets as a going concern in exchange for fair and reasonable consideration. *See, Mellon Bank N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1992); *See, also, Mellon Bank N.A. v. Official Comm. Of Unsecured Creditors*, 92 F.3d 139 (3d) Cir. 1996). Moreover, the Debtor's arm's length negotiations with the Purchaser ensured that the ultimate purchase price secured for the Purchased Assets is fair and reasonable under the circumstances.

**E.**    **The Sale Terms Were Negotiated In Good Faith**

36.    As set forth above, the APA is the product of good faith, arm's length negotiations between unrelated parties. Consequently, the Debtor requests that this Court find that these negotiations were in good faith and that the Purchaser is a "good faith purchaser" under §363(m) of the Bankruptcy Code.

**F.**    **Asset Sale Free and Clear of Encumbrances**

37.    In addition to seeking approval of a private sale outside of the ordinary course of business, the Debtor seeks approval to sell its assets as a going concern, free and clear of any and all liens, claims or encumbrances in accordance with §363(f) of the Bankruptcy Code.

38.    A debtor-in-possession may sell property to §§363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions are satisfied:

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

39.    The Purchase Price will result in sufficient proceeds to, *inter alia*, satisfy all secured claims, to the extent allowed, in full. Thus, the Purchased Assets can be sold free and clear of the secured claims and/or liens.

**G.**    **Assumption and Assignment of the Debtor's Nonresidential Real Property Lease**

40.    By Assignment and Assumption of Lease dated as of May 11, 2015 (the "Lease Assignment"), Macelleria Restaurant, Inc., the Debtor herein, assumed the lease (as amended by

the Lease Assignment, the "Lease") for the ground floor and basement of the building located at 1-3 Little West 12th Street, New York, New York (the "Premises"). In connection with, and ancillary to, the Debtor's request for approval of the Purchase Agreement, the Debtor seeks authority to assume and assign its interest in the Lease. The Landlord shall receive, from the Purchase Price, its cure amount, in such amount to be allowed by this Court, or otherwise agreed upon between the Debtor and the Landlord, and the Lease shall be deemed in full force and effect and free of any defaults or purported termination thereunder.

41.    Pursuant to §365(a) of the Bankruptcy Code, a debtor may assume or reject any executory contract, subject to the approval of the Bankruptcy Court. 11 U.S.C. §365(a). Once a contract is assumed, the debtor may assign such contract to a third party. 11 U.S.C. §365(f).

42.    Although §365(a) of the Bankruptcy Code does not provide a standard for determining when it is appropriate for a court to approve a debtor's assumption or rejection of an executory contract or an unexpired lease, courts have uniformly deferred to the business judgment of the debtor. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("A bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its "business judgment" to determine whether it would be beneficial or burdensome to the estate to assume it."); *see, also, In re Minges*, 602 F.2d 38, 43 (2d Cir. 1979); *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd*, 187 B.R. 111 (S.D.N.Y. 1995) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [to assume or reject an executory contract] will not be altered.").

43.    A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code section 365) (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

44.    Section 365(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to assume, assume and assign, or reject executory contracts and unexpired leases subject to the approval of the Bankruptcy Court, on the condition, *inter alia*, that the Debtor cures any default under the executory contract or unexpired lease and provides adequate assurance of future performance under such contract or lease.

45.    In the Landlord's Motion for Relief from Stay (Docket No. 31), the total pre-petition arrears due to Landlord total $323,837.62, and $108,412.50 post-petition through September 30, 2016. *See,* ¶12-16. Including the monthly rent for October, 2016 ($48,612.48), the total cure amount due to Landlord through the anticipated closing date of October 31, 2016 is $480,862.60.

46.    The Debtor has significant monetary claims against the Landlord for, *inter alia*, tortious interference of contact related to the Landlord's obstruction of the sale to Burger & Lobster (for accrued rent and legal fees), and for failure to properly segregate the Debtor's security deposit (9% interest from the date of the escrow, approximately $35,000). Accordingly, the Debtor proposes to escrow the entire cure amount of $480,862.60 from the sale proceeds until the Debtor's setoff claims against the Landlord are fully adjudicated or otherwise resolved.

47.    With respect to the "adequate assurance of future performance" of the Purchaser, Court held that it is a subjective test, and depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr.D.N.1. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc*., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

48.    The principal of the Purchaser is Christophe Perrin, a well-known celebrity chef. Chef Perrin was born and raised in Switzerland. With 25 years of experience, Chef Perrin has a solid background and knowledge in gastronomy. His experiences and travel all around the world in Russia, South East Asia, China, India, and the Caribbean have strongly influence his cuisine.

49.    Chef Perrin founded and owns Gaia Gourmet, which started as a sea-facing restaurant in Goa where produce and authentic international food were the main focus. After moving to Mumbai, Gaia Gourmet morphed into a professional service that caters to event and wedding planners, individual clients, consulates, and corporate brands that are looking to push the envelope with unique food-centric events. Chef Perrin currently manages two (2) hotels with a kitchen staff of over 100 employees each. Additionally, Chef Perrin is the executive chef of La Mangeoire, a French County style restaurant located in mid-town Manhattan, New York. Chef Perrin works closely with the New York State Wine & Food Festival, and located the Debtor's Restaurant as an ideal location for this endeavors with the Wine & Food Festival.

50.    The Curriculum Vital of Chef Perrin will be provided to Landlord as part of the due diligence package related to assignment of the Lease.

51.    Upon information and belief, Chef Perrin is well funded and backed by an investor that is a well-known property owner in New York City who can demonstrate, if required, over twenty-five million dollars ($25 million) in liquid assets. The Purchaser will provide such proof of financial wherewithal and adequate assurance to the Debtor and Landlord well in advance of the hearing on this Motion.

52.    Accordingly, the Debtor submits that it has established adequate assurance of future performance pursuant to §365 of the Bankruptcy Code with respect to prospective assignment of the Lease.

53.    Any assumption and assignment of the Lease will be subject to all of the provisions of the Lease, to the extent required by applicable law, and will be subject to all of the applicable provisions of the Bankruptcy Code.

**H.    Protections as a Good Faith Purchaser**

54.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section 363(b) is later reversed or modified on appeal. *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

55.    The procurement and subsequent negotiations with the Purchaser was the product of an arm's-length, good-faith negotiation. The Debtor, nor its principals, have any prior relationships with the Purchaser, and neither have any arrangements or intentions to conduct business in the future related to the Purchased Assets. Therefore, the Debtor will request a

finding that the Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

## **NOTICE**

56.    Notice of this Motion has been provided to (i) the Office of the U.S. Trustee; (ii) the Debtor's secured creditors; (iii) all taxing authorities; (iv) counsel to the Purchaser, (v) all counterparties to each of the Debtor's executory contracts and/or leases; (vi) all creditors; and (vii) all parties having filed a notice of appearance. The Debtor submits that said notice is adequate and proper.

## **CONCLUSION**

57.    The Debtor submits that a private sale of the Purchased Assets pursuant to the APA is a sound and prudent exercise of its business judgment. The sale to Purchaser will maximize the value of the Debtor and result in a distribution to all creditors.

58.    Accordingly, the Debtor respectfully requests that (i) the APA be approved, (ii) the sale of the Purchased Assets to Purchaser free and clear of all claims, liens, interests and encumbrances be authorized, (iii) the assumption and assignment of the Lease in connection with the Purchase Agreement be approved; and (iv) the Purchase is granted the good-faith buyer protections afforded in §363(m) of the Bankruptcy Code.

**WHEREFORE,** the Debtor respectfully requests that the Court grant all of the relief requested herein, together with such other and further relief as is just and proper under the circumstances.

Dated:  White Plains, New York
        September 26, 2016

                    DELBELLO DONNELLAN WEINGARTEN
                    WISE & WIEDERKEHR, LLP
                    *Attorneys for the Debtor*
                    One North Lexington Avenue

White Plains, New York 10601
(914) 681-0200

By: */s/ Jonathan S. Pasternak*   
   Jonathan S. Pasternak
   Julie Cvek Curley